Oral argument beginning with United States v. Porter, Ms. McIntyre. Good morning. May it please the court. A license plate reader associated Mr. Porter, whom it claimed had an outstanding warrant, with a specific vehicle. Based on that association alone, the officer seized the vehicle. The government never proved the basis of that association. And the officer later admitted that the car was not registered to Porter. The government is asking us here to blindly accept and rely on this information and alleged association without proving the basis for it or substantiating it in any way. This is a practice that this court and the Supreme Court has condemned. Additionally, without that information, the officer did not have independent reasonable suspicion that would have justified the stop of the vehicle on his own. Accordingly, the seizure of the vehicle violated the Fourth Amendment. The warrantless search that occurred after the fact also was not subject to any kind of exception to the warrant requirement and was also violative of the Fourth Amendment. And for those reasons, the weapon that was ultimately recovered should have been suppressed. Are you saying that they did not have any kind of information to the effect that Porter was associated in some way with this vehicle? That's correct. What they had was the limited information that we do know is that this vehicle… So there are three parts to your argument. One is reasonable suspicion to stop the car. Two is the plain view seizure. And then you have a Second Amendment or you acknowledge that Wilson is binding even though the mandate has an issue. We have the Second Amendment argument. I think if Wilson is not reconsidered, I think Wilson does foreclose our argument on 922-0. If this court obviously reconsiders Wilson or changes the opinion anyway, we might… But even until we might or might not reconsider its binding as a published opinion even though the mandate has an issue. I don't believe it's binding on this case at this point. I think there are other cases… You're really mistaken about that. Our opinions are judgments of our court from the day they get issued even if the mandate hasn't issued. So you look at the issue at the state of an opinion and that's the binding precedent if it's a published case. At this point, we would say that 922-0 is foreclosed. I didn't know, but he would know that. But we think obviously if this court reconsiders Wilson, that changes the argument that we have there. We weren't planning on… I wasn't planning on addressing the Second Amendment because of Wilson, but I'm happy to engage in that argument if the court would like to. I think the stop is where I'd like to begin here because I think that's the biggest issue in this case. Judge Smith, you were asking about the association. Right. In this case here, what we know is that there was some kind of association that was triggered by the license plate reader alert. But the government never proved what that association was, who made that association, or where it came from. Is this a carpenter argument or are you acknowledging that the police can scan licenses that the law requires us to display? We have a separate carpenter argument. But are you pressing that with any circuit authority because it's… I'm not. And in this point, I think even not considering carpenter, in this case, we didn't have reasonable suspicion to justify the stop of the car. And I would rely on Hensley and I would rely on this court's decision in Alvarez. But Alvarez is quite different, right? It's the Hispanic on a bike. We don't really know when. I was on that panel. Here, we do have this individual in this specific car has a warrant for aggravated assault. Well, it's different, of course, in the fact that we have that limited information. But in Alvarez, we still were acting under an alleged outstanding warrant. It was a roundup packet that was based on a warrant. And this court engaged with the collective knowledge doctrine, which I think the government is relying on here insofar as… But collective knowledge there was just Hispanic with a bike that has sort of banana handlebars, right? And I think the warrant. And in this case here, we don't have any kind of knowledge that was substantiated. So I would say even if the government had proven the association here, I think we still would need more than just that. But the point being that… What could they have done more? Are you sort of borrowing from tipster cases? I think that the government could have had somebody testify at the hearing who knew something about the association. It might have been in the warrant. They could have introduced the warrant at the hearing. They didn't do anything to affirmatively show anything about the association. And I think that that is the bare minimum that they had to do if we are going to say that they can rely on this information. Because they didn't even prove where the association came from. We don't even know that it came from a police channel. I think we can presume. But I still think the government has to prove, you know, this aggravated assault. So as in Houston, you know, the Houston decision. Yes. The government police can scan license plate numbers. And if it comes back, that license plate associated with somebody who has an outstanding warrant, you're saying they can't even go up and ask him for his driver's license? They have to do something else in that instant roadside stop? I think when you're dealing with an outstanding warrant and completed criminal activity in this case, they still had to have something more than the association. Maybe the officer could have relied on just the association and conducted the stop. But the government still had to then prove the basis for the association. I think there's a distinction between the officer's reliance on it in the moment and the government's burden of proof when we actually get to the suppression hearing. And in this case, the government had to in some way substantiate that association. And it failed to do so in any manner. I thought when they went up to him, he did give identification that corresponded to the same guy. He did. He said he was Elijah Porter. So I guess one last time, and it's not that you're answering imperfectly. It's me trying to think this through. Because roadside traffic stops based just on reasonable suspicion happen every day. Thousands of them. So what's the rule you're saying? A police officer that does the scan of the license and it comes back positive, yes, this car's associated with someone who has an outstanding warrant, can or can't go up to the window and say, based on that, I have reasonable suspicion you're someone who's a fugitive. I think in this case the officer had information that would make him, that did not make it a sufficient of probability that it was Porter driving. I think he admits that he ran the tag search and it said that the car was associated with first being James Stewart or Porter. Obviously Porter was the person for whom the warrant was out. I think that it's probably fair to say that the officer could go and ask for identification and stop the vehicle. But I think that because the basis for the reasonable suspicion comes from the license plate reader, the government is asking us to apply the collective knowledge doctrine, essentially arguing that the information that justified the stop, being the association and the license plate reader alert that was given by dispatch, that still needs to be substantiated. Because otherwise we're asking, the government's asking us to say, trust us. This information is real and it's reliable. But this is a third party flock license plate reader scan. We have no information about how this identifying association was ever made or created or who created it, what the source was, when it was. I think it's the bare minimum that we should be able to require the government to at least prove something that would have justified the basis for the alert. And in this case I think they could have done that by introducing evidence from anyone who had any kind of information about how the association was made. And maybe that was Crystal Springs where the warrant was originated from. But at the time that the officer actually sees the vehicle. So you're not saying that your rule requires that they do something in the moment. I'm not. You're saying once the suppression motion is filed, then they've got to prove up the validity of the LPO. If they want to rely on the collective knowledge doctrine. What's your best case for that second level requirement? It's interesting. I think that, I think Hensley says that. We can rely on this information, but the government still bears the burden of proving it. And I think Alvarez says that too in the section that discusses the collective knowledge doctrine. I think in that case, this court said, you know, because I believe one of the members of the panel had put forth that maybe the government made that argument, that oral argument. I don't know what the extent of the briefing was. But this court specifically included a section that said that we still need some kind of information and that the officer in that case couldn't prove it because the officer in that case didn't have any information as to the investigation, as to the time or the... And this is what happens with anonymous tipster cases. Exactly. But on the other hand, there's a presumption of regularity when it's law enforcement. There's a presumption. It's rebuttable, but there is that. I think in this case, we're still dealing with the collective knowledge doctrine, which the case law, in my estimation, clearly says that has to be proven in some way. And I think probably in most cases, it is proven at the hearing. But in this case, we have a situation where the officer admittedly knew nothing. And when he was testifying at the suppression hearing, he admitted to not knowing anything about the investigation. He didn't know anything about Mr. Porter. He didn't have a physical description. He didn't know anything about even where the alleged warrant came from. I mean, I think there's a bare standard that is usually met that just wasn't met here. And so I say my best case is being Hensley. I think Alvarez speaks to that. And I also think if we're talking about the independent reasonable suspicion, we have Kansas v. Glover. In that case, the Supreme Court said that it was a reasonable inference for an officer to believe that the registered owner of a vehicle would be the one who was driving the vehicle. In that case, we also had a situation where there was actual knowledge that the driver was driving with a revoked license. So it wasn't just a completed crime. We had active criminal conduct. And the court even said in that opinion that if we had additional information, that would force us to question whether he was the actual registered owner of the car, which we do have here with the officer's own, albeit limited, investigation revealing an association that wasn't the disjunctive, that or. And I think the Supreme Court itself had said that in those cases, it's not as clear cut. And so here, we needed something else beyond just this alleged association. Let's say they did have authority. Let's say we decide that. You still have a completely independent second argument that there's no plain view of the machine gun. That's correct. And that's based – is that pretty much just a Scott v. Harris argument? Yeah. I mean, I think we have – there's another layer to that argument in terms of the immediately apparent unlawfulness of the weapon because we have a regime where it's a shell issue regime. And we have contradictory testimony about what the officer actually saw in terms of the Glock switch or whether he just saw the barrel of the gun. So I think there's an additional layer in terms of the immediately apparent prong to that. But I think essentially our argument is that the officer, in understanding the great deference that's afforded to the district court in these cases, the officer – the body cam, which should be the best evidence in this case, did not show anything in that driver's cabin. And coupled with the officer's testimony that I think was both logically inconsistent and also just unbelievable in terms of his own reactions when finding the gun. But the district court did credit it. But the district court did credit it. So obviously it's a difficult burden to overcome. But I think in this case with the video evidence, we meet that burden here. Well, the video did not positively show that there was a weapon, but it didn't positively show that there was no weapon. It just – so we can discount the video in the sense that it doesn't tell us one way or the other. I would agree that it obviously didn't show one way or another. But I do think that at the hearing, the government offered the video as probative, and there was never any kind of argument that the video was not showing anything that would have otherwise been revealed. And I think the video is helpful insofar as you see the length in which the officer sticks his hand under the seat. And in terms of at least showing us the timeline of events and how things occurred, I think if anything, the video can bolster the inconsistencies and the credibility of the officer because the video shows us the way in which he acted. Insofar as he first claims at one point that he saw the gun at the time that he asked Mr. Porter to step out of the car. I think you can – the video obviously doesn't show yes or no, but I think you can – looking at the video there and then continuing to see the video, you at least are establishing that timeline. Then if that's true, you have the officer who says that he then left the car unlocked. He left a machine gun under the car. He went back and forth to the car at least three times and never recovered the gun. He then starts to go in the center console. So I think the video is helpful and useful to this court insofar as it creates a timeline that would undermine his credibility and his testimony about when and whether the weapon was ultimately in plain view. Additionally, it would be incriminating that nature of the gun as he claims to have seen it. He was going to arrest Porter anyway. Once the warrant came back valid. So then whether it's a machine gun or not, he's going to get access to that gun. That's true. But I think our argument there, and that being I think the inevitable discovery argument, is that in this case, yes, the warrant ultimately came back valid. But at the time that he was completing all of these actions that we would describe as misconduct, he didn't know whether the warrant was valid or not. So there's a world in which the officer waits two minutes to find out whether the warrant comes back valid. And then he begins the inventory search when he would have had an actual lawful basis to do so. But instead, here we have the officer who is beginning to rifle through the cabinets of the car, who was beginning to do all these things, allegedly complete an inventory search. But at that point, he didn't actually know whether the warrant was valid. Before your time's up, are you aware of any circuit that has invalidated 922-0 post-approval? I'm not aware of that, no. Final point on the inventory search, I think if we, or the inevitable discovery search here, if we apply that, we're basically saying, I think the government's argument is that if they hadn't done it wrong, they would have eventually done it right. And I don't think the inevitable discovery doctrine can allow for that. And that is really the argument as it relates to all of the Fourth Amendment violations in this case. All right. You've saved time for a vote. Thank you. Thank you. All right. It's either McCrait or McCrite. You can tell me which one. McCrite. McCrite. All right. May it please the Court. Good morning, Your Honors. My name is Hunter McCrite, and I am representing the United States. This case is about reasonableness. The officer was objectively reasonable when he conducted a traffic stop on Mr. Porter to check the identity of the driver based on the articulable facts he had received on January 25th of 2024. Your Honor, that information includes the information he received from the license plate alert, the information he received from dispatch, and the information he received from NCIC. So what specifically, I know you covered in your brief, but what specifically at that point connected Mr. Porter to the vehicle? Yes, Your Honor. And I think that's a three-step look. When the officer received the alert on the day, on January 25th, he received an alert that a white Ford Fusion was associated to an individual that was wanted. And he testified that when he received that alert, he immediately Well, associated with, does that mean he was the owner? Or what did it say about associated with? Did it use that word, or what do we mean by associated? So the officer testified that when he received the license plate alert itself, he just received a text message that that car was associated with somebody wanted for a warrant. But he didn't stop just at that alert and conduct the traffic stop. He contacted dispatch, which then told him that that car was associated with an Elijah Porter who was wanted for aggravated assault with a deadly weapon. And then he ran the tag number, which also showed that the car was associated with the store and with an EL Porter, which the officer testified that based on that, the car was associated with the Elijah Porter and that's who he was looking for. And at that point is when he conducted the traffic stop. All these sources of information use the expression associated with? I mean, how am I associated with other people's cars? Your Honor, the officer didn't clarify exactly what the association was. But I think when the alert came in, it was that that car was inputted into the license plate alert by, I think the officer testified, by law enforcement based on that warrant. And that they put it in that that car was associated with Elijah Porter. They did not state how it was associated at that time. But I think that's, the officer talked about when he runs it through NCIC, it's common for it to show who the car is registered for and it's common for it to come back to two different individuals. And I think when you look at that NCIC return, it would be common for it to be registered to two different owners or associated with two different people. I can understand registration and ownership. I've never actually heard that it's saying, oh, Steve Higginson is associated with something other than the Malibu he drives. Yes, Your Honor. Is that sufficient for them to pull over any car that they've decided to say I'm associated with? Yes, Your Honor. And so the Fourth Amendment permits an officer to initiate a brief investigative stop when there's reasonable suspicion on that vehicle. And we see this in Kansas v. Glover where the Supreme Court you don't have reasonable suspicion about a car. There's no reasonable suspicion about a car. No, Your Honor. No, Your Honor. It is whether there's reasonable suspicion to believe that Mr. Porter would be in that vehicle. And I think when you look at the totality of the circumstance here, based on three different databases telling the officer at that time, in that quick period of time. Three would triangulate. That would be good. But I'm still unclear. Don't they all come back to one entry in some other state? Steve Higginson's associated with this Jaguar. No. So in other words, could there just be one mistake that would suddenly get me being pulled over wherever I am? No, Your Honor. My understanding from the officer's testimony is that the license plate alert was inputted based on the Crystal Springs warrant. That the NCIC returned, that came back based on when he ran the tag number with who's registered owner and all that information. Okay. And so I think you're looking at two different aspects or two different databases that are both telling the officer at that time that this vehicle is associated with Elijah Porter. And I think when you look at that as a whole, of the information that the officer knew at that time when he was conducting that traffic stop, that gives him the reasonable suspicion to conduct it. So you're asking us to write an opinion that only when those two come together, you don't think each individually would be enough? No, Your Honor. And I'm not trying to draw a bright line. No, you don't think each individually would be enough? Or you don't want that opinion? Your Honor, I'm arguing is that that is not the situation we're here today. I'm not making a bright line argument and saying that he has to do all these. I think when you look at the facts here, the officer did have reasonable suspicion. And that's what we're arguing here with today. Your Honor, and that's further where when you look at the Kansas v. Glover argument, the Supreme Court touched on an officer using their common sense judgment and upheld a traffic stop based on when they ran a tag number and came back as the registered owner, had a suspended driver's license. And that the officer received that from that database, and using that and his common sense was enough reasonable suspicion to conduct a traffic stop. Here, when Officer Hoggart combined his information he received from three different databases and using his common sense, he conducted that traffic stop because he had reasonable suspicion to believe that Mr. Porter was going to be in that vehicle, and he was, in fact, in that vehicle. And, Your Honor, I think that's consistent with the Fourth Amendment. And the appellant talked about, in Hensley, and in the Supreme Court in Hensley, talked that if a flyer or a bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that a wanted person has committed offense, the reliance on that bulletin or flyer justifies a stop to check the identity of the driver. Your Honor, the officer here was relying on an arrest warrant issued from another Mississippi jurisdiction. Somebody had went in front of a judge and presented those facts and received a warrant based on probable cause. Your Honor, there is zero indication in Mr. Porter's briefings or argued at the motion to suppress that they were contesting the fact that there was actual probable cause for that warrant, which is what was being argued in Hensley. And so I think the officer was reasonable in relying on that information he was receiving from that. At some point, the collective knowledge doctrine does dissipate, and Alvarez is an example. Yes, Your Honor, and that was the next case I was going to talk about. In this court, held in Alvarez, that when an officer relies on information relayed through police information, it has to be based on articulable facts supporting a reasonable suspicion that the wanted person had committed an offense. And in that case, the court talked about how it was dealing with an open-ended description. As you touched on earlier, we were dealing with an individual on a bike, and it gave no general description of that bike. And this court talked about how that could lead to the stop of hundreds and hundreds of different people. That is not the situation we're dealing with here. This is the absolute opposite of what Alvarez was dealing with. The court talked about in Alvarez of how there was no description of the color of the bike. There was no talks about whether there was pegs on the wheels or anything like that. Your Honor, when the officer received this alert from the license plate alert, he was told he was presented a picture of the car, the tag number for the car, the make, the model, and the color of the car. So he knew every detail of that car before conducting that traffic stop. And he didn't just stop there. He furthered that information by, when going to dispatch, and he testified he immediately went to dispatch, and furthered and confirmed that that was, in fact, the car he was looking for, and confirmed that that was, in fact, he was looking for an individual associated with that car, Mr. Porter, and he was wanted for aggravated assault with a deadly weapon. And then NCIC told him that that car was also associated with Mr. Porter. And I think when you're looking at that, that is reasonable suspicion, and that is the opposite of what we were dealing with in Alvarez. So let's say he could pull it over. The plane view is a little stretched, right? The camera doesn't confirm it. He didn't see it three different times that he walks up. Correct? No, Your Honor. That's wrong? I will concede that the body cam does not show the gun, but reading the transcript, and the officer testified at the motion to suppress, that when he walked up to the car and was talking to Mr. Porter, that he saw the barrel, the slide of the gun, and he could see the shiny silver clock switch on it. And that he knew... So just so I understand these things, just seeing a gun would not be a machine gun. He's actually got to see this little switch. That had to be immediately apparent to him. But am I right? He went up there three times, and the first two times he didn't see it. No, Your Honor. He actually saw it on the first time. And if you look in the transcript and in the body cam, he testifies that I think it's about two minutes and 55 seconds into the body cam. He asked him, is there any guns in the car? And he testified that the reason for asking that is he wanted to see if Mr. Porter was going to be truthful, because at that point he had already seen it. And, Your Honor, I think just because the body cam doesn't show the firearm doesn't necessarily mean that the officer didn't see it. And I think the district court judge has already actually weighed that, and he talked about how the body cam was at a very different angle of what he's looking at with his eyes. It's on one side. His eyes were looking at it different. He was looking down at an angle. And the body cam wouldn't catch that. It doesn't necessarily show what your eyes are seeing. But the district court had considered all of that and found that the officer was, in fact, credible. And, Your Honor, I think when you're looking at plain view, this court talks about in Rodriguez that law enforcement are allowed to seize the area where the item was located, the item was in plain view, and the incriminating nature of the item was immediately apparent. Your Honor, the officer was standing outside of the vehicle after conducting a lawful traffic stop on Mr. Porter, and while standing outside, he could see the barrel, he could see the slide of the gun, and he could see the silver switch on the firearm. And, Your Honor, he testified he immediately knew that that switch, or that the silver part on the gun was a switch. And he knew the immediate criminal aspect of that, and he knew immediately that a switch is what converts the gun to a machine gun. And so he knew at that point. Just factually, it's a small point, but if you're saying he knew from pretty early on he was just going to test Porter, I thought when he actually later, he has sort of a profanity, like, oh, S-H-I-T. Yes, Your Honor. So how would that be consistent if he knew it was there anyway? And I can't dispute that when he did actually pull it out, he did say, hey, this is a machine gun, and he had some profanity with it. But I don't think that discredits the fact that he did see the firearm, and that's corroborated by the fact of he actually started at that point questioning Mr. Porter of, hey, is there any firearms in the car? Because he wanted to see if he was going to be truthful, and he knew what the situation he was dealing with at that point. And so I think his questions, and I think when he looked at it. He had argued to the district court? Yes, Your Honor. He's testifying that he saw it the whole time. He was just going to see if the guy's truthful, but then the body cam actually has him saying, oh, S-H-I-T-H. And they argued that that defeats the truthfulness of his testimony? Yes, Your Honor. But if you look at the transcript of the officer at the motion to suppress, I asked him, well, why did you ask that question? And his reasoning for asking that is because he knew what he was dealing with at that time, and he wanted to see whether Mr. Porter was going to tell him about the firearm in the car. And I think looking at the officer's experience, and he talked about how he had six years as a supervisor on patrol, taking that into account, I think based on his training and experience, him actually asking those questions to see what he was dealing with, kind of corroborates the fact that he immediately saw that firearm, and he knew what he was dealing with. And I think plain view allows him to seize that firearm. And, Your Honor, and as you have touched on, this is a situation in which the district court has already considered and determined that he was, in fact, a credible witness. This court held in Gomez that a factual finding is not clearly erroneous, as long as it is plausible in light of the record as a whole. And clearly erroneous standard is particularly strong when the district court ruling is based on the live testimony of that witness. And that the deference is given to the finder of the fact who hears that live testimony of the witness because of the opportunity to judge the credibility of those witnesses. Your Honor, there is nothing in the record that plainly contradicts that Mr. Hoggart, or that the officer Hoggart saw this firearm. And that is a determination and something that the district court spent a lot of time on, in his opinion, in weighing and explaining why he found the officer to be credible. And I think when you look at that, and look at the fact that the district court weighed all this and found him to be credible, that that should be given some deference. And he found that the officer did act reasonable under all the circumstances and that the firearm was found to be in plain view. Your Honor, even if you find that the officer didn't have, or didn't find the firearm in plain view, the gun would have been discovered anyways. And this court touched on this with the appellant. The gun would have been discovered in the inventory search of the vehicle. This is something Officer Hoggart talked about. He said that the vehicle was subject to towing after the warrant was confirmed with Crystal Springs. Because at that point, Mr. Porter was arrested, and that the vehicle had to be towed. And he said that he was following the Gautier Police Department standard procedures, which is to inventory the vehicle before being towed. He also talked about how part of that inventory search is one of the places he routinely looks for is under the driver's seat, which indicates that firearm would have been found during that inventory search anyways. He also talked about how even an inventory search in this case actually did happen. After Mr. Porter's warrant was confirmed and he was arrested, they did inventory the vehicle. And so I think that further corroborates that even if you guys find that he did not find that firearm in plain view, the firearm would have been discovered anyways because it would have been found during the inventory search to which they did conduct. One just totally separate question. Procedurally, this went to a stipulated bench trial? Yes, Your Honor. Why wasn't there a conditional guilty plea? Why aren't we just getting the suppression issue up from a conditional guilty plea? Your Honor, I can't speak to those facts. I handled this case. Well, you handled it below. I did, Your Honor. So they didn't ask for a conditional guilty plea, or did the government say it wouldn't agree to it? Your Honor, I can't remember whether that was a situation in which we just agreed at that point just to handle it as a bench trial or if it was we were not doing a conditional plea. He got acceptor's responsibility even though he put the government to its proof? He did, Your Honor. And that is because it was a stipulated bench trial in which we all stipulated to the facts of that trial. And, Your Honor, for those foregoing reasons, I would ask that the judgment in this case be affirmed. And if there's no other questions, I'll be seated. Thank you, Mr. McBride. Thank you. Ms. McIntyre for rebuttal. Do you know the answer to that question? I don't. I wasn't privy to that part of the case. Yeah, I apologize. No, no. Beginning with what the government discussed as being an open-ended description that in other cases had not been enough for a reasonable suspicion, in this case we only knew about the car. We didn't have any actual description of Porter. What we had about Porter himself is even less than the cases that the government cited. He doesn't have any physical description whatsoever of what he looks like, his age, his sex, his build, his race, any identifying information at all. So at that point you're saying that even though they had information that he was associated with that vehicle and that there was an arrest warrant for him for a serious crime, that that was not enough to stop the vehicle to make some kind of further inquiry? It's essentially two parts. I think it arguably could have been enough if the government had substantiated the basis of the association. But without substantiating that information, the government would have had to have proven that the actual arresting officer had reasonable suspicion at the time. And I don't think they need that simply with an alleged association without anything more about Porter and with additional facts that would call into question whether Porter was the actual one who was driving the vehicle. And I think part of this problem is with the association. Associated was the language that was used in the hearing. That was the term that the officer continued to use throughout the suppression hearing. And what we know about the, quote, association is only that the officer had confirmed the association from a printout for the tag that was generated by NCIC. But the officer admitted that that did not necessarily mean that the vehicle was registered to him. The officer admitted that the vehicle was registered to James Stewart. And the officer stated that he thought that the association may have come from Crystal Springs, which, of course, was the source of the warrant. But the time that he stopped the car, he didn't know where the warrant was out of, and that's the record at 207. He had believed that it was an association that was made by whomever had put the information into the system, but he didn't know the source, and he testified to that at record 223. I think without more, this amorphous association just can't meet the government's burden. As I said, we're dealing with a situation where I don't think, if we cannot rely on the collective knowledge doctrine, which I think is where the association comes from and what the government is relying on when it talks about information gathered through police channels, again, presumably where this license plate reader information is coming from, the bare minimum that they must do is prove the source of the association, especially where the officer who testifies at the hearing has no idea where it came from. As Judge Higginson was mentioning, based on this, we have a third-party license plate reader system, these FLOC systems. We know that they're contracting with various police departments, but we don't know where the source of this information is actually coming from. It might not have come, this association, from the actual warrant or from the originating police department. To just rely on any alleged association between Victoria McIntyre and the Toyota Corolla that drives down the street, I think that, first of all, that's not reasonable, and it's not what the collective knowledge doctrine and that even the bare level of reasonable suspicion would allow for in this case. The beeper in the Supreme Court not's decision gives more? I think that the beeper is different, at least insofar as I'm talking about the reasonable suspicion here, because in the beeper, they had an actual investigation, and they were all involved in tracking the car in that way. At this moment, I'm distinguishing based on the fact that we don't have a situation where there's an officer who is actively involved in the investigation that resulted in the warrant. We just have an officer who received a text alert that this car is somehow associated with this person. I think the fact that we have identifying information of the car itself isn't enough. Identifying information of the car might have been reasonable, and I think I would concede would be reasonable, if we had some kind of evidence that Mr. Porter had been seen in this vehicle, that Mr. Porran is known to travel in this vehicle, that a witness had seen this vehicle fleeing during... Am I turning the Fourth Amendment upside down if I say, but it's just reasonable to think, and therefore the protection we all get is if they walk up to the window and it's not Porter, that's the end of the stop. But I don't think it's reasonable to let any association stop any car on that basis. I think it's still a seizure under the Fourth Amendment. I see my time is up. Thank you. Yes, thank you, Ms. McIntyre. Your case is under submission.